## ELLIS–FOSTER CO. v. REICHHOLD CHEMICALS, Inc.

### Civ. No. 6814.

United States District Court
D. New Jersey.

Jan. 26, 1950.

Lindabury, Steelman & Lafferty, Newark, N. J., by Andrew J. Steelman, Newark, N. J., and William D. Burrows, New York City, of counsel, for plaintiff.

Leavitt & Talley, Elizabeth, N. J., by Harry C. Bierman, New York City, of counsel, for defendant.

FAKE, Chief Judge.

This is a patent suit in the sphere of chemistry. The plaintiff charges infringement of its patent and seeks an accounting. The defendant answering pleads non-infringement and charges invalidity of plaintiff's patent. The issues joined are highly technical in nature and require close analytical consideration.

The defendant has introduced in evidence three patents covering subject matter originally invented in Germany by Krzikalla and Wolff. The German patent was applied for in Germany on March 15, 1930, and issued there on June 29, 1939. On May 12, 1930 one Johnson, a British subject, applied for a British patent based on the German patent. It was published in England on September 17, 1931, from which date it speaks for present purposes. The British patent number is 355,281. On February 16, 1931, Krzikalla and Wolff, assignors to I. G. Farbenindustrie, applied for a United States patent covering the same subject matter as the above, and a patent issued here on April 28, 1936, No. 2,039,243.

The patent in suit was issued here in the United States to Ellis on December 8, 1936, No. 2,063,542, based on his application therefor dated May 20, 1932. This application was a continuation in part of an application filed in 1922.

"Plaintiff admits that United States patent No. 2,039,243 dated April 28, 1936 and British patent No. 355,281 dated November 18, 1931, disclose the same invention as is claimed in the patent in suit."

From the foregoing it is noted that the subject matter of all these patents was first invented in Germany by German nationals. Had this suit been based by plaintiff on these foreign patents, the problem here would be greatly simplified, and under the ruling in Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L. Ed. 1071, the work of the prior German inventors would be given full force and effect as prior in time to the Ellis patent in suit. To understand the reasons why this cannot be followed, in the instant case, it is necessary to bear in mind that this suit is not based on those foreign patents or the American patent arising thereon, but rather upon the later invention and patent of Ellis, an American citizen. The explanation for this strict differentiation is found in R.S. 4923, 35 U.S.C.A. § 72, which reads as follows: "Whenever it appears that a patentee, at the time of making his application for the patent, believed himself to be the original and first inventor or discoverer of the thing patented, the same shall not be held to be void on account of the invention or discovery, or any part thereof, having been known or used in a foreign country, before his invention or discovery thereof, if it had not been patented or described in a printed publication."

It appears here that Ellis believed himself to be the first inventor, hence these foreign inventors could not be read against his right to a patent until the same were "patented or described in a printed publication." The earliest date as to which these foreign disclosures can be read against Ellis is the date of publication under the British patent law, to wit, September 17, 1931. The evidence here discloses that Ellis had invented the adduct, without which none of the patents would function, on September 8, 1931, nine days before the British publication. See laboratory records in evidence as P-7. It follows that the Ellis patent in suit is not invalidated by these prior disclosures. This conclusion is strongly fortified by a case on all fours with this, to wit, Vacuum Engineering Co. v. Dunn, 209 F. 219 in the Second Circuit, sustaining the lower court conclusion found in D.

C., 202 F. 967. The reasoning in those opinions, when fully understood, is so convincing that no further elaboration is necessary.

*Prior Disclosures*

In stressing the effect of the patent in suit plaintiff's counsel takes the position that Ellis was the first to teach the making of maleic resins, and later a modification of his earlier teaching, resulting finally in a product of commercial value because of its uniformity. Ellis is said to have discovered, in 1922, that a new synthetic resin could be produced by combining rosin, maleic acid and glycerol by heating them simultaneously together. This, it is said, resulted in a product which for lack of uniformity was not commercially profitable. Thereafter, in 1931, he conceived the idea of reacting the rosin and maleic acid in the absence of the glycerol, resulting in an adduct to be reacted with glycerol at a later stage. Thus setting up what is termed a two stage process. This resulted in a uniform commerical product with an acid number substantially above that of rosin. The amazing thing about it is said to be the discovery that maleic acid would react with rosin to produce a new acid. The product is used generally throughout the varnish and lacquer industry.

The defendant contends that Humphrey, in patent No. 2,025,947, claimed and received a patent for the same thing as that contained in the first stage of the Ellis patent. The Humphrey patent was granted December 31, 1935, on an application filed September 3, 1931, some five days before the Ellis invention date.

When Humphrey took as his first step the use of an ester of abietic acid, he was in fact taking rosin combined with alcohol. This combination of rosin with alcohol is what is termed a rosin ester. To this he added the maleic acid. It resulted in an acid number lower than rosin.

Ellis takes as his first step a combination of rosin, not an ester thereof, with maleic acid. So it appears that Humphrey and Ellis differ in their first stage in that Humphrey uses an ester of rosin, while Ellis

uses plain rosin, resulting in an acid number substantially above rosin.

Does this indicate to the mind of one skilled in the art that Ellis has done any more than to proceed with the natural next step? Humphrey having first taught the use of rosin ester, comes Ellis with rosin straight. This leads to a consideration of the effect of the addition of the maleic acid as practiced by both Humphrey and Ellis; and it brings into play what is known as the Diene theory of conjugated double bonds in the field of organic chemistry, well known to all chemists. In the light of the teachings of this theory Humphrey says: "The addition compound may be formed as the result of reaction occurring between the two unsaturated bonds of the abietic acid ester and the unsaturated linkage of the maleic anhydride yielding an ester of abietic acid which contains a reactive anhydride group." If I understand this, it means, by "abietic acid ester" a rosin alcohol combination, and the "maleic anhydride" means, among other things, maleic acid, and that the combination of these causes an addition of, or union of, the unsaturated linkages of rosin alcohol with the unsaturated linkage of maleic acid. Attempting to reduce this to a layman's language: The Diene theory teaches that the conjugated double bonds of the rosin molecule link or unite with the unsaturated double bond of the maleic acid forming one molecule, leaving the alcohol radical taking no part in the addition reaction. This, I think, is what Humphrey teaches to those skilled in the art.

Looking now to the teaching of Ellis, he says: "The polybasic acid compounds of rosin are formed not only in the presence of glycerol but also when a resin, containing rosin or other natural resin containing conjugated double bonds, is treated with an alpha beta unsaturated acid." I take it that this means that when a resin, containing rosin with conjugated double bonds, is treated with maleic acid, which contains a single double bond, a polybasic acid compound results. Humphrey calls this "an ester of abietic acid which contains a reactive anhydride group * * * or abietate-maleic anhydride" compound. Thus Ellis

seems to me to teach that the conjugated double bonds of rosin link with the double bond of the maleic acid forming one molecule where there were two before, thus coinciding with Humphrey's teaching; and it points up the fact that alcohol was not necessary, being mere surplusage in Humphrey's teaching. Ellis found this out and in eliminating the alcohol he took the next natural step, which one skilled in the art would take.

Returning now to a further consideration of what is termed the two stage process: It is true Humphrey does not claim a two stage process. He does, however, disclose it. In this connection he says, "I have not claimed herein the method involving the reaction of an alcohol with a reaction product of an abietic acid ester and maleic anhydride." If I understand this, it means that Humphrey does not claim the process of using glycerol later. The glycerol is, to the understanding chemist, the alcohol last above mentioned. Perhaps he disclaimed because of the prior disclosure of Krzikalla and Wolff, the German inventors in the British patent, as suggested by counsel for defendant. It is immaterial, however, why Humphrey so disclaimed. In doing so he actually taught it five days before Ellis, and my thought is he disclaimed because he was only stating what was known as the skill of the art and desired to avoid the penalties involved in claiming too much and not making a timely disclaimer.

Continuing with the second stage of Ellis and Humphrey, Humphrey states: "The abietic-maleic anhydride compound may be employed in protective coatings such as lacquer, varnishes, etc., but it is preferably first converted into one of its more complex esters, by treatment with a polyhydric alcohol such as * * * glycerol." Humphrey states further: "The reaction product may, if desired, be neutralized with an alcohol, as for example * * * a polyhydric alcohol * * * and where the treatment is with a polyhydric alcohol, as ethylene glycol, glycerol, etc., the treating will be at a temperature of about 200°C–275°C." If I understand this, Humphrey is teaching those learned in the art that a

substance, such as that found in Ellis as an adduct in his first stage, may be later treated in a second stage with glycerol. Thus coinciding with Ellis, and here Humphrey would seem to anticipate Ellis.

The essence of the Humphrey patent resides in the combining of a rosin ester, to wit, a chemical mixture of rosin and alcohol, with maleic acid thus producing a new chemical compound.

The essence of the first step in the Ellis patent resides in combining rosin with maleic acid, thus producing a new chemical compound.

They differ only in the use of alcohol.

The result of the use of the alcohol is to lower the acid number in the product, and so it is that Humphrey has a lower acid number than Ellis.

Does the failure to use alcohol by Ellis amount to invention? I think not, for the reason that if a learned chemist desired to increase the acid number of this product he would know that extracting the alcohol would do it. The alcohol took no part in the Diene reaction.

It being known that alcohol would reduce the acid number, and that it took no part in the Diene reaction in Humphrey, then all Ellis did in leaving out the alcohol was only that which one skilled in the art would naturally do to obtain a higher acid number. This is neither discovery nor invention, and in doing so he was only following the teachings of Diels-Alder and Humphrey.

■ The foregoing requires a holding of invalidity as to Claims 17, 19 and 28 of the Ellis patent in suit.

■ This leaves claim 2 of the Ellis patent for consideration. It covers a product formed by a simultaneous reaction of rosin, maleic acid and glycerol. Ellis found this to have no commercial value because of its lack of uniformity. It follows that it was not "useful" as required by the Statute, and, therefore, the claim is void. Plaintiff's brief is convincing on this point when it says: "Uniformity in the commercial resin is absolutely essential * * *

a resin which cannot be produced uniformly has no commercial value."

### Infringement

■ If the patent in suit is found to be valid upon appeal, then, in that event, I find that defendant infringes. There are some 6 charts, together with the deposition of Stefan H. Baum, Vice President of defendant, before the Court disclosing defendant's procedure, and in each instance they follow patented teachings of Ellis in what amounts to a two-stage process in the use of rosin and maleic acid in the first stage.

### Prior Use

■■ Defendant is the successor to certain practices carried on by Synthe-Copal Co. Inc. at Buffalo in the year 1928. I cannot conclude that the processes there involved amounted to a two stage process because the laboratory records do not disclose it as such, and resort is had to oral testimony of witnesses now or formerly in the employ of defendant to spell out a two stage process. Such evidence must pass the test classifying it as beyond a reasonable doubt as in The Barbed Wire Patent case, Washburn & Moen Mfg. Co. v. Beat 'Em All Barb-Wire Co., 143 U.S. 275, at pages 284 and 285, 12 S.Ct. 443, 36 L.Ed. 154. This, in my opinion, it does not do.

The finding of material and ultimate facts are as follows:

1. Plaintiff, Ellis-Foster Co. is a corporation of the State of New Jersey and maintains a research laboratory at Montclair, New Jersey. Defendant, Reichhold Chemicals, Inc., is a corporation of the State of Delaware, with a place of business and manufacturing plant at Elizabeth, N. J.

2. This is an action for infringement of Ellis Patent No. 2,063,542, which was duly issued to plaintiff, Ellis-Foster Co., on December 6, 1936, on an application filed by Carleton Ellis on May 20, 1932. At the time the application was filed Carleton Ellis duly made oath that he believed himself to be the original and first inven-

tor of the thing for which he solicited a patent.

3. Ellis-Foster Co. is now the owner of Ellis Patent No. 2,063,542, and has been since its issuance.

4. The patent in suit discloses an alleged improved process of making maleic resins which involves carrying through a reaction between rosin and maleic acid or anhydride by heating them together to form an alleged new chemical compound which is itself an acid, and thereafter heat-treating the resulting reaction products with a polyhydric alcohol such as glycerol to form the final resin.

5. The claimed novelty of the process is in the step of first carrying through the reaction between the rosin and the maleic acid or anhydride without any glycerol or other free or combined alcohol being present.

6. The process of the patent is based on Carleton Ellis' alleged discovery of the fact that one particular acid (rosin acid) will react with another particular acid (maleic acid) to form an alleged hitherto unknown compound which is itself an acid. This alleged new acid compound has been called "rosin-maleic acid" by the patentee. Humphrey disclosed earlier that the rosin acid ester, a neutral compound, had the peculiar ability to unexpectedly react with one particular acid—maleic acid—to form a theretofore unknown new chemical compound, thereby disclosing the peculiar attribute of the rosin molecule.

7. There has been extensive commercial application of the process of the patent in suit coupled with other patents, and this has resulted in commercial success.

8. All manufacturers of maleic resins in the United States, as far as known by plaintiff, are licensed under the patent in suit, coupled with others owned by plaintiff, with the exception of the defendant, Reichhold Chemicals, Inc.

9. Substantial royalties, aggregating upwards of $500,000 covering the patent in suit and other patents owned by plaintiff, have been paid to Ellis-Foster Co. by the following licensees, to wit: American Cyanamid Co.; Alkydol Laboratories, Inc.; Cook Paint and Varnish Co.; Devoe & Raynolds Co. Inc.; France, Campbell & Darling, Inc.; Falk & Co.; Hercules Powder Co.; Krumbhaar Chemicals, Inc.; Libbey-Owens-Ford Glass Co. (Paramet Div.); Monsanto Chemical Co.; Rohm & Haas Co., The Resinous Products Div.; U. S. Industrial Chemicals, Inc.; The Glidden Co.; Gilman Paint & Varnish Co.; The Kay & Ess Co. and Lilly Varnish Co.

10. The defendant, Reichhold Chemicals, Inc., was licensed under the patent in suit, and other patents owned by plaintiff, from November 15, 1940 to March 30, 1943, when it cancelled its license.

11. In the manufacture of maleic resins, when free maleic acid is reacted with glycerol, a gel may be formed unless very careful control is exercised.

12. If the alleged new rosin-maleic compound is first formed and then after this compound is formed it is caused to react with glycerol, it forms a soluble resin.

13. One of the most desirable properties of a resin is uniformity in the resin from batch to batch.

14. The principal advantage asserted for the process of the patent in suit is that when maleic acid is first reacted with the rosin to form the "rosin-maleic compound" which is subsequently reacted with glycerol a soluble resin is obtained which can be produced uniformly.

15. Claim 19 of the patent in suit covers the process of first reacting a natural resin containing conjugated double bonds, such as rosin, with maleic acid by heating these materials together and after the reaction products have been formed, further treating these reaction products by heat treatment with a polyhydric alcohol, such as glycerol.

16. It is stipulated that maleic acid and maleic anhydride are equivalents.

17. The defendant, Reichhold Chemicals, Inc., has since 1947 been manufacturing maleic resins by heating together rosin and maleic anhydride for a period of approximately three hours to cause them to react, without any glycerol or other alcohol being present and then further treating the reaction products formed in the first step

of the process by adding glycerol and heating to form the final resin.

18. Claim 17 is in issue and covers preparing reaction products by heating together a natural resin, such as rosing, with an acid, such as maleic acid, the resulting reaction product having an acid number substantially higher than that of rosin.

19. Claim 17 specifies an alpha beta unsaturated polybasic organic acid. Maleic acid is such an acid.

20. The process of Claim 17 is employed by defendant in carrying out the first step of its process in which rosin and maleic anhydride are reacted for approximately three hours.

21. Claim 28 of the patent is also in issue and covers the product as made by the process of Claim 17 using rosin and maleic acid.

22. In defendant's operations this product is the "rosin-maleic compound" which is formed after rosin and maleic anhydride have been reacted for approximately three hours.

23. Prior to 1937 Reichhold Chemicals, Inc. had made maleic resins in accordance with a procedure whereby the rosin, maleic acid and glycerol were all heated together in such a way that free maleic acid reacted with glycerol.

24. Dr. Stefan Baum, Vice President of Reichhold Chemicals, Inc. and in charge of manufacturing operations at the Elizabeth plant, testified that they could not keep the batches in control using this process and that "viscosity varied all over the map".

25. Uniform viscosity is an important property in commercial resins.

26. This procedure was discontinued by defendant in 1937, when the new process as specified in Finding No. 17 was adopted.

27. Plaintiff admits that United States Patent No. 2,039,243, dated April 28, 1936, and British Patent No. 355,281, dated November 18, 1931, disclose the same invention as is claimed in the patent in suit.

28. United States Patent No. 2,039,243 and British Patent No. 355,281 issued to I. G. Farbanindustrie Aktiengesellschaft A. G. relates to an invention made in Germany by Hans Krzikalla and Werner Wolff, and the U. S. application was filed under the convention application in Germany.

29. British Patent No. 355,281 was cited by the Patent Office during the prosecution of the Carleton Ellis application which matured as the patent in suit. The patent in suit was allowed by the Patent Office after Carleton Ellis filed an affidavit under Patent Office Rule 75; see Exhibit P-2—page 82.

30. United States Patent No. 2,039,243 issued on April 28, 1936.

31. Dr. George Barsky, defendant's expert, admitted that none of the anticipating patents (with the exception of British Patent No. 355,281 and United States Patent No. 2,039,243 referred to in Finding Nos. 29 and 30) shows or discloses the claimed invention of the patent in suit as defined in Finding No. 5 in which a reaction is first caused to take place between rosin and maleic acid without any glycerol or other free or combined alcohol being present.

32. Two of the prior art patents cited by the defendant, United States Patent No. 1,722,566 and United States Patent No. 1,541,336, are patents which issued to the plaintiff, Ellis-Foster Company, on applications filed by Carleton Ellis on Dec. 26, 1922 and Feb. 14, 1923, respectively. These patents, filed by Carleton Ellis, show the procedure for making maleic resins by heating the rosin, maleic acid and glycerol all together without carrying out a reaction between rosin and maleic acid in the absence of glycerol or other polyhydric alcohol.

33. As early as 1922 the Ellis-Foster laboratories had begun experimental work on such resins and this work was carried out extensively during the period 1922 to 1931.

34. The Ellis-Foster laboratories were skilled in the making of such resins during the period from 1922 to 1931. It did not occur to anyone in the Ellis-Foster laboratories that a new chemical compound could be formed by reacting rosin with maleic acid without any glycerol or other polyhydric alcohol being present until Carleton Ellis made the alleged invention of the patent in suit in 1931. However, the prior

teachings of Diels-Alder in what is known as the Diene theory and in the Humphrey patent No. 2,025,947 would have disclosed it.

35. The reactions disclosed in the Ellis patent in suit and the Humphrey patent are peculiar in nature, and the constituents have peculiar chemical properties causing them to react together to form unexpectedly new chemical compounds.

36. The evidence shows that the first time Dr. George Barsky, defendant's expert, had ever heard of the new Ellis compound was as a result of the disclosure of Carleton Ellis' invention by the Ellis-Foster laboratories to the American Cyanamid Company, by whom Dr. Barsky was then employed.

37. This disclosure took place between October, 1931 and June, 1932, and as a result the Rezyl Corporation, a subsidiary of American Cyanamid Co., began commercial use of the process of the Ellis patent in June, 1932 as a licensee of Ellis-Foster Co.

38. Beginning in August 1928 the Synthe-Copal Co. of Buffalo, New York, a predecessor in business of defendant, Reichhold Chemicals, Inc., began commercial manufacture of maleic resins by heating the rosin, maleic acid and glycerol all together without carrying through the reaction between rosin and maleic acid in the absence of glycerol or other polyhydric alcohol.

39. This procedure is substantially the same procedure as is disclosed in Ellis Patents No. 1,722,566 and No. 1,541,336 (referred to in Finding No. 32) relating to the work done in the Ellis-Foster laboratories in 1922–1923.

40. The Synthe-Copal Co. was later merged with Reichhold Chemicals, Inc., the defendant, who carried out the same procedure until 1937, when this process was discontinued and the new process adopted.

41. Prior to August 1928 the laboratory records of the Synthe-Copal Co. show that experimental batches of maleic resin were made by Mr. Severin in the laboratory by heating together rosin, maleic acid and glycerol.

42. Mr. Severin's experimental records show that in mixing the materials before heat was applied to esterify the materials the maleic acid was sometimes added directly to the rosin in small amounts to prevent foaming and as soon as the foaming disappeared the glycerol was added and the materials heated to form the resin.

43. This procedure was not carried forward into any commercial operation for which records were produced.

44. Dr. Foster D. Snell, plaintiff's expert, and Dr. George Barsky, defendant's expert, agreed that Mr. Severin's experimental records at the Synthe-Copal Co. did not show or teach that a new chemical compound could be formed by heating rosin with maleic acid without glycerol or other polyhydric alcohol being present.

45. From August 1928 and 1937 the commercial practice of Reichhold Chemicals, Inc. and its predecessor in business, the Synthe-Copal Co., involved heating the rosin, maleic acid and glycerol all together to form the resin.

46. The change by the defendant to the new process where the rosin and maleic anhydride are first reacted for a period of approximately three hours before the addition of the glycerol did not take place until after the patent in suit issued.

47. Following cancellation of its license from plaintiff, effective March 31, 1943, defendant has continued to use the process of Claim 19 and has also used the process of Claim 17 in respect to the first step in defendant's procedure of making maleic resins. Defendant has also made the product of Claim 28 as an intermediate product in its process of making maleic resins.

## Conclusions of Law

1. The prior disclosures, as set forth in the foreign patents, do not affect the validity of plaintiff's patent for reasons set forth in an opinion filed herewith; nor are there any other disclosures in this record save only those set forth in Humphrey patent No. 2,025,947 which affect the validity of the patent in suit and the Diels-Alder teaching known as the Diene theory.

2. Claims 2, 17, 19 and 28 of the Ellis patent in suit No. 2,063,542 are invalid for reasons set forth in an opinion filed herewith.

3. Evidence of alleged prior use by defendant and its predecessors is found insufficient to establish a prior use.

4. If the patent in suit is found to be valid on appeal defendant infringes.